17-20465

16

TRULINCS 55762039 - RASHID, MASHIYAT M - Unit: MIL-D-B

---

FROM: 55762039
TO:
SUBJECT: Letter
DATE: 12/31/2020 07:55:31 PM

Personal Letter for Feb 18th 2021 Sentencing;
　　　　　　　　　　From: Mashiyat Rashid
　　　　　　　　　　Case No: 17-cr-20465
　　　　Request: Video Sentencing (if in person sentencing not-available on date)
　　　　　　　　　　UNDER SEAL
　　　　　　　(Please CC: Gerry Gleeson, Jacob Foster)

Dear Judge Denise Page Hood,
　　I hope this letter sincerely finds you well. I have been meaning to write for sometime now during this Pandemic. I wanted to write the court with the most gracious and most humblest intent. During the pandemic the world has changed with so many uncertainties. Millions infected, tens and thousands of deaths, state-wide lockdowns and job losses. I recently contracted the COVID-19 virus with a positive test result Dec. 2nd 2020. I work in the Milan FDC kitchen preparing breakfast, lunch and dinner daily for 250 inmates. That day 9 of the 14 kitchen inmates test came back positive. They immediately took those kitchen staff inmates who tested positive to an isolation quarantine in the North Unit. I was placed in Cell 103 which had no running hot water or heat. For about a week, I was in bad health. It felt like a hurricane went through me. I had difficulties getting up and breathing. I Thank the lord everyday in my 5-daily prayers for being alive, hoping to one day re-unite with my two young kids (Ariana and Issa), my wife Mahi, and my aging parents. Due to visitation restriction at the FDC I haven't been able to see my family. I have recovered from the virus. A note about "recovered" inmates-- Of the 13 inmates who died last week, two men, one at FCI Victorville and another at FCI Lompoc had contracted COVID-19 months ago and were considered "recovered" before getting much sicker and died. Now, for instance State of Michigan Dept of Health said last week that it is currently investigating 115 of "recovered" State inmates testing positive for COVID-19 three months after they were believed to be COVID- free. In short many are being re-infected, Milan FDC inmates included. Jails have potential for re-exposure. Many inmates after being infected have had lingering damages months later here at the FDC of chronic headaches, even cognitive issues. Social distancing is nearly impossible in a jail environment which involves over-crowding food lines, phone lines, computer usage and shared showers. COVID-19 is something that will continue to infect and kill inmates of the BOP and Detention Centers. As of Dec.18th there were 75+ confirmed cases of COVID-19 in the West Unit of Milan FDC alone. During the COVID pandemic inmates are lockdown 23 hour 40 minutes daily allowing 20 minutes daily for shower and personal time out of their cell. In the general population, prior to March 2020 COVID lockdowns (West & East Unit) living conditions continued to be difficult after the Jan 2019 violent attacks and murder of an inmate. Inmates like myself are locked to their cells 20-hours a day, per Milan FDC bi-laws. This is a major contributing factor to inmates mental health and physical well being. Milan FDC is simply not equipped for long term inmates like myself (detained 41months). This oppressive environment has played an effect on my mental health. I respectfully refuse to share this with Detention Center employees, counselors or psychologist who simply can not make the situation better, other than provide drugs.
　　Judge Hood, I wanted to bring another very serious matter that has effected my mental health, during my 41 months of incarceration. I wanted to write this letter to inform the court and yourself (ruling Judge on my case) that the plea terms that was agreed upon that brought me to the 7-hours of interviewing with Government prosecutor Mr. Foster, changed on me AFTER my interviews. I have provided attorney/ client privileged Exhibits to corroborate with my letter. My counsel advised me that the "ball was on our court to give the prosecutor a plea offer on the condition that I interview and cooperate on the investigation." Please see EXHIBIT #2/ Page1. I did just that. The terms my counsels, Mr. Gerry Gleeson and Mr. Thomas Cranmer both former prosecutor, agreed to with Mr. Foster were (35 points 168-210months). I was told we would get to argue loss amount to $20million on sentencing day. I agreed to those terms and Mr. Gleeson put this in a handwritten document EXHIBIT#1 and a re-cap of that in EXHIBIT#2, that I have attached. EXHIBIT#1 provides 3 columns, done prior to Mr. Gleeson mailing a letter to me dated May21st 2018, which is EXHIBIT#2. I've redacted the EXHIBITS so that it would not compromise this case and any future Gov't cases, as they contain sensitive attorney/ client materials. I would still like to continue with my attorney/ client privileged materials and dialogues with Mr. Gleeson. Many items are still highly sensitive and active to Gov't prosecutor.
EXHIBIT#2;Page2 attached states in writing from Mr. Gleeson, what was discussed in my meetings with him after the dialogues he had with Mr. Foster. First, that I WOULD NOT be scored vulnerable victims BUT will be discussing patients being "vulnerable" as part of my "plea/ cooperation deal." Upon understanding my Rule11 in its entirety which included guidelines scoring of 35 pts 168-210 months, I was quickly interviewed after the EXHIBIT#2 letter from Mr. Gleeson to me. After two days of 7-hours of what my counsel Mr.Gleeson said was "great proffers" based on his dialogues with Mr. Foster, the Government prosecutor came back weeks later with LIFE guidelines with 30-yr stat max. My guidelines essentially doubled after my interviews, essentially making it a whole different Rule11 plea, AFTER my interviews. This was not our agreement! My doubled guidelines are terrifying and have caused a great deal of panic and anxiety for my aging mother. I request with the most humblest intent to kindly be sentenced so that she can move on from this tragedy. I've done everything asked of me, I've

TRULINCS 55762039 - RASHID, MASHIYAT M - Unit: MIL-D-B
---

testified at the trials of 4 physicians in the group. They were found guilty and that, ONLY scratches the surface of my "cooperation." I did EXACTLY what was asked and in return my Rule11 guideline scoring doubled. I realize Mr. Gerry Gleeson and Mr. Thomas Cranmer are former prosecutor(s) in this district, well decorated, capable and respected but they could not explain why my guidelines simply doubled after my interviews. I was mislead by my counsel on these guidelines that brought me to "cooperate." Mr.Gleeson defended himself by stating "Mosh, I told Jake don't f**k me on this and he still did." My family that were engaged during the plea process, with family members that flew in were shocked, when Mr.Gleeson told them "he had been pim*ed by the prosecutor." This was devastating to hear.. Please see EXHIBIT#3. I explained to Mr.Gleeson, that I'm TIRED of being lied to, all the while getting me to make these "statements" against all these people, and the most I would be willing to add to the guideline scoring after the fact, is an additional 1-point for the wire fraud component which they superseded me on. The superseding occurred AFTER my interview also. This would take my guideline scoring to 36pts 188-235 as my starting point. Please see EXHIBIT#4. At this point the tone of defense counsel had changed. He started warning me that the prosecutor is to blame for the changed guideline scoring, that this will follow me to sentencing, that the prosecutor will look for the highest sentence possible on sentencing day. At that point, I did want to bring this to the attention of the court on my plea hearing day, but Mr.Gleeson strongly advised against it. He cited this will be better served after testifying, so that I DO NOT get burned on the cooperation like I did with the guideline scoring. That by bringing this to the courts attention now, would be highly risky and a path to taking an open plea and losing cooperation credit. These series of incidents have been traumatic. It effects my daily life within the confinements of these cold prison walls. The multiple adjournments of my sentencing makes it tougher for my family to move on. Its time for closure. I realize my co-defendants are all out on bond, they will look to further push their sentencing dates out due to court closures. My situation is very different, subjected to years of lockdowns under harsh conditions. I've done my part. With the most humblest request to the court, if I could be sentenced on my February 18th sentence date. If Government needs me for, "more work" to entail testifying at more trials, grand jury from any of my proffer session etc, they can issue a Rule 35.

I, state these facts, with Exhibits because we live in a great Nation that allows transparency, truth, law & order. I can assure the court that I will never go into an industry that bills the Government for services, that I have no background in. My dependency on physicians hurt me in this case. I've learned a lot. I wish to learn and grow from this. I should have made better decisions, irrespective of how physicians practiced medicine or kickbacks that some demanded. I let the revenues and profits cloud my thinking. I'm truly ashamed. That was ignorant of me as a businessman. I let too many decisions be made by others. My trial testimony verifies this. Testimony verified, Physicians never talked to me about patient care, but about their payroll matters along with their income. Trial testimony by me shows, I did not use, nor know how to use, the billing and medical software components. I accept responsibility financially on this conspiracy, those illicit earnings were in bank accounts of mine and when the wrong was exposed, all those funds were returned and accounted for. No hidden treasures just full transparency and accountability. Yet the physicians, that directly committed this crime went un-charged, or signed low plea guidelines (Bolina, Saad 18-24 months) and cooperated and returned none of their illicit earnings. The disparity is huge between them and I. This instant offense will be my first felony as a 40-year old. This similarly to my knowledge, will be all my co-conspirators first offense. See EXHIBIT#5. Exhibit#5 list all physicians and individuals that played a direct role, in the billing and loss amount. Many were charged but many went un-charged. The first column in EXHIBIT#5 shows 10 physicians names who went uncharged. Yet, based off the indictment these physicians committed "medically unnecessary" billings because the Government garnered the full total billing(s) amount to be fraudulent. I'm essentially held accountable for the actions of physicians that went un-charged, who accounted for millions in loss amount. This with the humblest intent, in no way, is me "blame shifting" or "minimizing" my role, fact is I've been charged in a "conspiracy." My role was the finances, I have no medical background. This crime could not have occurred without physicians and their medical decisions. That is the whole scope of this indictment. The Physicians utilizing their medical licenses. I did not go to a 4-year medical school, or attended a 4-year residency program afterwards, or do a fellowship and trainings in pain management. Those physicians did. I went to business school for undergrad, which taught me revenues and profits. EXHIBIT#6 shows an allocated print-out done by Miller Canfield on revenue collected from Medicare from all the company bank statements. There is a discrepancy on the actual received revenue amount. Miller Canfield counsel (Cranmer, Gleeson, Elsey) found $42m collected based of this EXHIBIT#6. Government prosecutor found $51m. Discovery and 302's shows physicians received half of the illicit proceeds. The other half, my management company received. Out of the $21million I received, I returned all of it when state, fed, city, payroll taxes and other taxes are included. My Rule11 has about 17million returned on top of all the applicable taxes paid, leaving a loss amount of 0 from my end of the "conspiracy". I realize 10 physicians went un-charged and that I'm held accountable for their medical decision that lead to this loss amount. I've accepted responsibility. There are 4 other columns in EXHIBIT#5. Based off the physicians, I'm most closely situated with Dr. Abdul Haq and Dr. Glenn Saperstein and their guideline ranges(97-121 months). Dr.Haq was the first physician in our group since Day 1 in 2008. Haq was practicing pain well before working with me, I learned a lot from him. Haq and Saperstein both billed MILLIONS. Dr. Frank Patino, introduced Saperstein to the group and trained both Haq and Saperstein. Patino pioneered the "injection for prescription" theme, he demanded payments on all physician revenues. Patino was an outlier.

TRULINCS 55762039 - RASHID, MASHIYAT M - Unit: MIL-D-B

----------------------------------------------------------------------------------------------------

FROM: 55762039
TO:
SUBJECT: Letter#2
DATE: 12/31/2020 09:37:18 PM

Saperstein Rule11 has no mention of Tri-County MILLIONS in loss amount that he billed, with his medical decisions. Leaving again, the loss amount to only me, similar to what the 10 physicians did that are in Column #1 of Exhibit #5. I know I did wrong, but my guideline ranges should have never doubled after my interviews and "accepting of responsibility". Fact is, with guidelines range of 168-210 which was the understanding, Government recommendation on sentencing date after Mr. Gleeson explained everything would have been minus 50% of guidelines range with cooperation credit. Mr. Foster recommendation should have been at that point 84-105 months. Now, with this change, the recommendation will be MUCH higher, which is depressing and devastating. Again, I've done everything asked of me. There is a running theme in the West Unit which entails all the "trial prep" I did with prosecutor Mr. Foster at Milan FDC. On one occasion it was a family visitation day for inmates in the West Unit and I was interviewed for 8-hours in the same visitation room, with inmates and their families around. I told Mr. Gleeson to pick another day as this was a bad idea instead I was ignored and "trial prepped." Mr. Foster had flown in (out of town prosecutor). My safety and security was secondary in a pod filled with drugs, violence and violent criminals. Even until this day, I hear of it from new inmates coming in. Word travels within these detained jails (County Jails to Milan). These are all imminent and serious threats in a detention center that houses very high risk inmates who are looking at the death penalty, life sentences because of people who like me have "cooperated" against them. Any pay back becomes a win to them. I do not wish to be relocated, I should not be subjected to that. The only thing I have is to be sentenced. Once sentenced, I can take advantage of the 1st Step programming and R-DAP all programs designed to expedite my return home. Programs I have not been able to utilize the past 41-months due to being in a detention center, in essence extending my sentence. For example 1st Step Act eligible programming inmates like myself would get 10-15 days of good time per month which equates to 4-6 months good time credit per year, on top of the new 1st Step Act standard 54-days per year good time. I've already missed out on 20-months of 1st Step Act good time credit over the 41-months of incarceration. All things my co-defendants can take advantage of if they are to do a custodial sentence at all. This becomes very frustrating. Again, I've done everything asked of me, which makes this shocking.. I've never been in legal trouble. I've never served a custodial sentence, my time already served on this sentence will reflect the seriousness of this offense and promote respect for the law. I have a great deal of remorse for my actions and have fully cooperated in an attempt to redeem myself and right my wrongs. My sentence already served will provide just punishment. My sentence already served will 100% deter me in the future. I've let a lot of people down. My rise to wealth was abrupt, from the inner city projects. I grew up and was raised in the Cass Corridor just a few miles from the courthouse. Watching my 9-year old daughter walk into the visitation rooms of the prison to visit me and cry out loud before going into hug me has changed me. I view things differently and and realize the consequences for my actions. I vowed to never be the cause of my daughters pain again.

Judge Hood, I'm still skilled and talented, once out I will make amends with my wrong. I work well with people and I'll put an emphasis on the inner city youth through education, sports, media and entertainment. The best advise I give these young guys that come through this detention center, when they ask for advise is "stay out of the streets." This is something my mother made sure I did as a youth. Even though I did stay off the streets, I failed her. That is one of my greatest regrets. For the past quarter of a century my mother has dedicated her life as a teacher and principal at an underserved school in Detroit serving K-12. We need more role models like her in our community. That school now puts out college grads that become teachers, lawyers, physicians and engineers back into the Metro Detroit community and beyond. Its a great story. I've coached basketball at the school and moving forward that is something I'll look to put an emphasis on if given the opportunity. On sentencing day many people will look forward to me redeeming myself and during my allocution I hope the court will see that I'm reformed and remorseful for what has happened and that my humility and dignity will have me rebound from this. The process has already begun many years ago while detained. I'm currently housed in a similar environment in which I was raised. During my almost 4 years of incarceration there have been homicides, drug overdoses that resulted in death, riots and constant 24-hour lockdowns in a small cell. Rough environments but similar to the 80's in the Cass Corridor, Milan FDC is also a tough place filled with drugs and violence which plagued my childhood. Throughout all of this I reverted to the honest work ethic that kept me out of the streets and out of trouble growing up. I've worked my whole life since the age of 12 and for the last 2 years I've once again returned to my roots working at the Detention Center kitchen, in the dish tank and food line, two shifts a day- 7 days a week. This is an exhausting job that Milan administrators have a hard time filling with quality, trusting inmates. Kitchen theft is so common, that the rate of turnover is high. The workload is strenuous that inmates don't stick around. Hard work and humility is not a stranger to me. I've also had some downfalls here in Milan. I've gone to the SHU. Ms. Hood I have provided you EXHIBIT#7 which shows that I was put in the SHU Dec.2019. The whole kitchen staff was in the SHU. We are provided 4-hour out of our cell daily as mentioned earlier. New policy had been implemented that our work load time will be considered our "rec time out of our cell." The Inmate kitchen staff refused to do that. Foreman agreed policy was bad, to work all day and be locked down to a cell immediately after entering the pod. Based off that, we were approved to leave the kitchen by the foreman ONLY to be handcuffed and put in the SHU for our actions hours later when they could not find other inmates to take our positions. For 16-days during the Christmas and New Years Holiday, I was locked up in the HOLE, unable to contact family during the

TRULINCS 55762039 - RASHID, MASHIYAT M - Unit: MIL-D-B

----------------------------------------------------------------------------

holidays, with no out time from cell. Once we returned from the SHU, administrators also agreed the policy was bad, they changed the policy back to allow us our daily 4-hour of "rec time" outside of our kitchen services.

Judge Hood, I have a young son with special needs who is at a critical age in his development. I wish to help him develop and grow. I have a teenage daughter who owns my heart that was 9 years old when I left. If the court feels on sentencing day a longer sentence is necessary, if the court can find it in its heart to re-unite me with my two young children and finish off the remainder of the sentence under home confinement. Second option, is to self surrender to my designation, for my personal safety, security and well-being to avoid going through Oklahoma and other dangerous transits where incidents occur. This would be out of courtesy for the grand scale of cooperation and trial testimony I've provided which are still an imminent threat from other inmates and to avoid potential re-exposure to the COVID-19 virus. I, with the most humble and respectful way, request the court sentence me on my scheduled sentencing date of Feb 18, 2021 for all the factors listed above in this letter. In person sentencing would be ideal, but given all the intangibles (COVID-19, mental health and well being, family) video sentencing would be highly appreciated rather than further delays. I have signed and returned to Mr. Gleeson the CARES ACT, 20-A0-038 waiver of in-person sentencing, and attached a copy of that with this letter. On sentencing day I have two charges against me the "conspiracy to commit healthcare fraud" as mentioned in this letter in great specific detail and "Money laundering." Money laundering charge entailed me transferring $6.6 Million from Bank of America to Bank of America, from my name to my name. Pretty straight forward. When Government froze that account they got the full $6.6 Million plus a 6-figure surplus on the interest accrued. Again, like my first charge I should have known better. Money clouded my thinking. I should have never transferred and invested that money. Gov't on Rule 11 wants 10-years for that crime. Similar to my first charge, second charge also had the funds simply in Bank Of America under my name. Charge one, many physicians went uncharged-- 10 in total and they accounted for MILLIONS in loss amount that I'm held accountable for. Two others physicians charged elsewhere (Patino, Saperstein). See EXHIBIT#5. Physicians that did plea guilty, their Rule 11 shows no return of funds and low guidelines, which makes for a very interesting "conspiracy" on crimes that could not have been committed without them-- the physicians). No matter how long or short the court wishes to sentence me on sentencing day, I've learned A LOT. I'll be able to finally re-focus on my mental health once sentenced. My mental health and well-being has been greatly challenged and compromised for many years now while being detained in this environment mentioned above. I'll look to continuously improve myself as a person. I look forward to closure. With all due respects to the court, I most graciously and humbly request to be sentenced on Feb 18th 2021, my scheduled sentence date, for all the reasons listed above.

Request to the courts in the most gracious and humblest manner are:
1. To be sentenced on Feb 18th 2021, for all the reason mentioned above.
2. Requesting time serve on sentence day. If a longer sentence is necessary, requesting home confinement for remainder duration, for all the reasons listed above in this letter.
3. OR to self-surrender to my assigned designation for two major reason as mentioned above.

P.S. Happy New Year. This was typed on New Years Eve. May God bless America and the World with a better 2021. If there are any grammatical error my sincere apology as I typed this as fast as I could. Requesting and receiving special time out to write this private personal letter to avoid issues with other inmates.

With the Utmost Respect and Honor to the Court,

Mashiyat Rashid

Exhibit #1

|  | $42 million | 135 million | $20 million |
|---|---|---|---|
|  | 6 | 4 | 6 |
| Loss | 22 | 24 | 20 |
| HCF | 4 | 4 | 4 |
| Soph Mean | 2 | 2 | 2 |
| Leader | 4 | 4 | 4 |
| Obstruction | 2 | 2 | 2 |
|  | 40 | 42 | 38 |
| Acc -3 | -3 | -3 | -3 |
|  | 37 | 39 | 35 |

✓ eliminate
did they
to this

Exhibit #2

Founded in 1852
by Sidney Davy Miller

# MILLER CANFIELD

**Miller, Canfield, Paddock and Stone, P.L.C.**
840 West Long Lake Road, Suite 150
Troy, Michigan 48098
TEL (248) 879-2000
FAX (248) 879-2001
www.millercanfield.com

**GERALD J. GLEESON, II**
TEL (248) 267-3296
FAX (248) 879-2001
E-MAIL gleeson@millercanfield.com

MICHIGAN: Ann Arbor
Detroit • Grand Rapids
Kalamazoo • Lansing • Troy
FLORIDA: Tampa
ILLINOIS: Chicago
NEW YORK: New York
CANADA: Windsor
CHINA: Shanghai
MEXICO: Monterrey
POLAND: Gdynia
Warsaw • Wroclaw

May 21, 2018

**PRIVILEGED & CONFIDENTIAL**

Mashiyat Rashid, Inmate #174296
Sanilac County Jail
65 N. Elk Street
Sandusky, MI 48471

    Re:    *United States of America v. Mashiyat Rashid, et al*
            Case No. 17-cr-20465

Dear Mosh:

the ball is in our court to make a proposal to him with respect to a plea. Wednesday, we discussed options for such a proposal, and I promised to put those options in a letter to you so that you can think about what you want to do.

*Exhibit #2 Continued*

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

<u>Privileged and Confidential</u>  -2-  May 21, 2018
Mashiyat Rashid

likely just the
is as a

months. Mr. Foster has mentioned certain victim adjustments (more in terms assessment after an adverse trial outcome

# MILLER CANFIELD

Founded in 1852
by Sidney Davy Miller

GERALD J. GLEESON, II
TEL (248) 267-3296
FAX (248) 879-2001
E-MAIL gleeson@millercanfield.com

Miller, Canfield, Paddock and Stone, P.L.C.
840 West Long Lake Road, Suite 150
Troy, Michigan 48098
TEL (248) 879-2000
FAX (248) 879-2001
www.millercanfield.com

MICHIGAN: Ann Arbor
Detroit • Grand Rapids
Kalamazoo • Lansing • Troy
FLORIDA: Tampa
ILLINOIS: Chicago
NEW YORK: New York
OHIO: Cleveland
CANADA: Windsor
CHINA: Shanghai
MEXICO: Monterrey
POLAND: Gdynia
Warsaw • Wrocław

August 31, 2018

**ATTORNEY CLIENT PRIVILEGED**

Mashiyat Rashid, Register No. 55762-039
FCI Milan
Federal Correctional Institution
P.O. Box 1000
Milan, MI 48160

    Re:    *United States of America v. Mashiyat Rashid, et al*
            Case No. 17-cr-20465

Dear Mosh:

over the last week or so to

But the agreement gives the Government the sole say as to the value of your cooperation. The Government attorney (Jacob Foster) has suggested that you are very good candidate for cooperation credit, but I caution whether we can completely trust him as he has changed his position on guideline scoring over time (which might mean he would do the same to potential cooperation credit).

# MILLER CANFIELD
Founded in 1852
by Sidney Davy Miller

**Miller, Canfield, Paddock and Stone, P.L.C.**
840 West Long Lake Road, Suite 150
Troy, Michigan 48098
TEL (248) 879-2000
FAX (248) 879-2001
www.millercanfield.com

GERALD J. GLEESON, II
TEL (248) 267-3296
FAX (248) 879-2001
E-MAIL gleeson@millercanfield.com

Detroit • Grand Rapids
Kalamazoo • Lansing • Troy
FLORIDA: Tampa
ILLINOIS: Chicago
NEW YORK: New York
OHIO: Cleveland
CANADA: Windsor
CHINA: Shanghai
MEXICO: Monterrey
POLAND: Gdynia
Warsaw • Wrocław

September 14, 2018

**ATTORNEY CLIENT PRIVILEGED**

Mashiyat Rashid, Register No. 55762-039
FCI Milan
Federal Correctional Institution
P.O. Box 1000
Milan, MI 48160

Re: *United States of America v. Mashiyat Rashid, et al*
Case No. 17-cr-20465

Dear Mosh:

Hopefully, our discussion today gave you further food for thought with respect to resolving the case. I respect your position on a plea to a twenty year court and a ten year count with guidelines of 188-235 months. I remain of the belief that it would be better to offer guidelines of 235-293 months given all the variables we discussed today (I am saying this to get

Very truly yours,

Gerald J. Gleeson, II

GJG/llr

cc: Thomas W. Cranmer, Esq.

32101567.1\156705-00001

Exhibit #5

Indictment charged the full 42 Mill from Medicare as ALL "Medically Unnecessary" YET 10 of 23 physicians & pain physicians are UN-charged / NOT-charged

Tri-County Physician Group - Physicians

Indictment Lay-Out at Case Completion

| Column 1 | Column 2 | Column 3 | Column 4 | Column #5 |
|---|---|---|---|---|
| NOT charged, Immunity OR Signed Omerta non-prosecution Agreements | Signed Rule 11 Plea Deals | Went to Trial Indicted elsewhere UN-related to Tri-County | | Already Sentenced, Rashid business Associate Sentenced |
| 1. Douglas Wood | 1. S. Adamczyk (57-71) | 1. S. Pappas | 1. Frank Patino | 1. Ramasami Gunabalan, M.D. Sentenced to 20 months |
| 2. Vinod Sharma | 2. Z. Sheikh (87-108) | 2. M. Zaheer | 2. Glenn Saperstein Judge Tarnow (47-121) | |
| 3. Ali Taj | 3. M. Bolina (18-24) | 3. J. Betro | | |
| 4. Ibrahim Debaja | 4. H. Saad (19-24) | 4. T. Omar | | |
| 5. Aniket Khan (Testings/Readings) | 5. H. Qazi (41-51) ★ | | | |
| 6. S. Pelli-Reddi | 6. S. Borgula (30-37) ★ Physical Therapist | | | |
| 7. Mohamad Osman (Pain Director) | 7. A. Haq (97-120) | | | |
| 8. Nader Khan (Testing/Reading) | 8. Y. Mozeb (Stat Max 15 yrs) ★ | | | |
| 9. Samytha Patel | 9. K. Rasol (51-63) | | | |
| 10. Fadi Jaafar (Pedeshirt) | 10. M. Rashid (LIFE) ★ | | | |
| | 11. M. Braun (30-37) 292-365 | | | |

Bill to the methods these physicians submitted cases that are Free from MA Prosecution

These 10 individuals independently & collectively billed MILLIONS from the $42 Mill collected

10 go un-charged. These numbers should be adjusted if ONLY 60% of the physician billed $51 Mill based on Gov't estimates YET all

Spearheaded and pioneered the $42 mill in LOSS AMOUNT as these two individually accounted for Millions utilizing their medical licenses in contributing to the LOSS AMOUNTS of: $42 Mill / $51 Mill Gov + estimate

Based on Saperstein Rule 11 there was NO mention of Tri-County Million in LOSS amount he contributed to.

★ = non-physician

loss amount with Dr. or even a partial surplus from me, it this "conspiracy"
re-charged? Adjusted Reviews would leave

*[Handwritten at top:]* 2008
TCW Group   Year: 2017   Exhibit #6   *[signatures]*

**Draft-Subject to Revision**
**Privileged and Confidential Attorney Work Product**

*[Handwritten:]* All payments NOT medicare when cross referenced with bank statement.

| Medicare-Reimbursed Services | |
|---|---|
| TCP – facet joint injections | $14,067,001.27[1] |
| Aqua Therapy – total | $3,717,438.13[2] |
| Tri-State – facet joint injections | $572,622.00[3] |
| New Center Medical – facet joint injections | $191,678.45[4] |
| Global Quality – total | $3,437,665.81[5] |
| National Laboratories – total | $16,828,657.26[6] |
| USHHC – referrals from TCW entities | $2,006,035.61[7] |
| Vitality – referrals from TCW entities | $1,300,000[8] |
| Senior Link – referrals from TCW entities | $300,000[9] |
| Bio-Magnetic – referrals from TCW entities | [Unknown] |
| Total | $42,421,098.53 |

30198880.2\156973-00001
DRAFT

*[Handwritten notes:]*
1. ALL physician driven.
   a. evaluate + treat
   b. referral
   c. These are company numbers of 20+ physicians; Their revenue, referrals out etc. 5 were actually indicted?? These numbers should reflect Physicians on this indictment.
2.

*[Handwritten left side:]*
Gov't  49,457,829.50
        1,939,088.19
        ―――――――
        51,396,917.69

---

[1] Total amount paid to provider, limited to injections.

[2] Total amount paid to provider, not limited to injections (which appear to be vast majority of claims). Injection-specific data not provided.

[3] Total amount paid to provider, limited to injections.

[4] Total amount paid to provider, limited to injections.

[5] Total amount paid to provider, not limited to injections (which appear to be vast majority of claims). Injection-specific data not provided.

[6] This figure represents total Medicare payments to National Laboratories, per Medicare's prior finding that all of the lab's work was ineligible for reimbursement.

[7] Total amount paid to provider, limited to referrals from Haq, Patino, Pappas, Betro, Joseph, Zahoor, Peddireddy, Rasool, Saperstein, Adamcyzk, Sharma, and Omar. (Possibly other TCP referrals in the data.)

[8] Warrant affidavit figure, subject to confirmation.

[9] Warrant affidavit figure, subject to confirmation.

9

Exhibit #7

## Part II - Committee Action

17. Comments of Inmate to Committee Regarding Above Incident:

*No Comment*

| 18. A. It is the finding of the committee that you: | B. ___ The Committee is referring the Charge(s) to the DHO for further Hearing. |
|---|---|
| X Committed the Prohibited Act as charged.<br>___ Did not Commit a Prohibited Act.<br>___ Committed Prohibited Act Code(s). _____ | C. X The Committee advised the inmate of its finding and of the right to file an appeal within 20 calendar days. |

19. Committee Decision is Based on Specific Evidence as Follows:

BASED ON THE OFFICERS STATEMENT THAT THE INMATE REFUSED TO WORK FOOD SERVICE, THE COMMITTEE FINDS THAT THE INMATE COMMITTED THE PROHIBITED ACT OF 306- REFUSING TO PROGRAM

*Charge downgraded from 212 to 306*

20. Committee action and/or recommendation if referred to DHO (Contingent upon DHO finding inmate committed prohibited act):

RECOMMENDATION
306- 7 DAYS LOSS OF COMMISSARY

21. Date and Time of Action: _____ (The UDC Chairman's signature certifies who sat on the UDC and that the completed report accurately reflects the UDC proceedings).

Chairman (Typed Name/Signature)    Member (Typed Name)    Member (Typed Name)

INSTRUCTIONS: All items outside of heavy rule are for staff use only. Begin entries with the number 1 and work up. Entries not completed will be voided by staff.

Distribute: Original-Central File Record; COPY-1-DHO; COPY-2-Inmate after UDC Action; COPY 3-Inmate within 24 hours of Part I Preparation

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

D-1 MASHIYAT RASHID,

    Defendant.

Case No. 17-cr-20465

Hon. Denise Page Hood

## WAIVER OF IN-PERSON SENTENCING

Mr. Rashid is aware that the Court has approved sentencing hearings to be conducted via video conference if 1) a defendant consents to the use of video teleconferencing after consultation with his/her counsel and 2) the presiding judge finds that the proceeding cannot be further delayed without serious harm to the interests of justice. *In re Coronavirus (COIVD-19) Phased-in Recovery Plan and Extension of Temporary Procedures Under the Coronavirus Aid, Relief, and Economic Security (CARES) Act*, 20-AO-038 at pp. 4-5.

Mr. Rashid understands that Federal Criminal Rule 43 requires that a defendant be present in person to plead guilty to a felony and be sentenced. Fed. R. Crim. P. 43(a). He is aware that courts have held that "the defendant must be present" and requirement is generally not waivable. *United States v. Bethea*, 888 F.3d 864, 866-67 (7th Cir. 2018). Mr. Rashid has been advised that during the COVID-19 pandemic, however, Congress has authorized federal judges to take a

felony guilty plea and sentence by video or teleconference if the defendant consents after consulting counsel, and if "the district judge in a particular case finds for specific reasons that the plea or sentencing in that case cannot be further delayed without serious harm to the interests of justice."

Mr. Rashid has conferred with the undersigned counsel by telephone and in person at the Milan Detention Facility regarding his decision with respect whether to consent to being sentenced via a video teleconference.

Mr. Rashid has been advised and understands that courts have found that "...anyone who has used video conferencing software is aware, virtual reality is rarely a substitute for actual presence." *United States v. Williams*, 641 F.3d 758, 764 (6th Cir. 2011).

Mr. Rashid has been advised and understands that courts have noted:

- there are "...unique benefits [to] physical presence."

- that "virtual reality is rarely a substitute for actual presence and that, even in an age of advancing technology, watching an event on the screen remains less than the complete equivalent of actually attending it."

- That "[t]he judge's absence from the courtroom materially changes the character of the proceeding." That "[t]he important point is that the form and substantive quality of the hearing is altered when a key participant is absent from the hearing room, even if he is participating by virtue of a cable or satellite link."

- That a "face-to-face meeting between the defendant and the judge permits the judge to experience 'those impressions gleaned through ...

any personal confrontation in which one attempts to assess the credibility or to evaluate the true moral fiber of another.'"

- That "[w]ithout this personal interaction between the judge and the defendant—which videoconferencing cannot fully replicate—the force of the other rights guaranteed" by Rule 43 is diminished.

Mr. Rashid and his counsel have further conferred with respect to other potential benefits and detriments of sentencing being conducted by video teleconference.

Having been so advised and informed, Mr. Rashid freely and voluntarily elects to waive his right to an in person sentencing and requests that the Court conduct the sentencing hearing via video teleconference.

Respectfully submitted,

By: /s/ Mashiyat Rashid

Date: 12/7/20

Mashiyat Rashid

MILLER, CANFIELD, PADDOCK and STONE, P.L.C.

By: _____
Gerald J. Gleeson, II (P53568)
840 West Long Lake Road, Ste. 150
Troy, MI 48098
(248) 267-3296
gleeson@millercanfield.com
*Attorney for Defendant*

Date: _____

Mashiyat Rashid 55762-039
Federal Detention Center
PO Box 1000
Milan, MI 48160



7014 1820 0002 3484 5595



RECEIVED FEB -1 2021 CLERKS OFFICE U.S DISTRICT

U S MARSHALS

Honorable Denise Page Hood
231 W. Lafayette Blvd.
Room #730
Detroit, MI 48226
Priority Legal Mail

Please file
17-20465-US v
Rashid (Hood)
Letter re COVID
Thanks