UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

v.

D-1 Mashiyat Rashid,

Defendant.

No. 2:17-cr-20465-DPH-RSW

Offenses:   18 U.S.C. § 1349
            18 U.S.C. § 1957

Maximum Sentence:
18 U.S.C. § 1349: 20 years / $250,000
fine or twice the gain/loss
18 U.S.C. § 1957: 10 years / $250,000
fine or twice the gain/loss

---

# UNITED STATES' COMBINED MOTION AND BRIEF FOR REDUCTION IN SENTENCING UNDER U.S.S.G. § 5K1.1 AND MEMORANDUM IN AID OF SENTENCING

---

The United States submits this Combined Motion and Brief for Reduction in Sentence under United States Sentencing Guidelines Section 5K1.1 and Memorandum in Aid of Sentencing pertaining to defendant Mashiyat Rashid. For reasons of, among others, general deterrence of health care fraud and opioid distribution, including of corporate crimes committed by health care executives, the United States respectfully requests that the Court (1) impose a sentence of 216 months (18 years), a 40% reduction off of the mid-point of the Sentencing Guidelines range of 360 months; (2) order Rashid to pay restitution in the amount of

$51,396,917.70, jointly and severally with his co-conspirators in the fraud; (3) order a special assessment of $200; and (4) order a three-year term of supervised release.

The government will be prepared to address Rashid's cooperation in greater detail at the sentencing hearing, but notes that this is an unusual case in which Rashid seeks to be sentenced prior to the completion of his cooperation, in light of the circumstances at the Federal Correctional Institution in Milan and the length of his pre-sentence incarceration.  As a result, Rashid, like any other defendant, may be eligible for a further reduction based on Rule 35 if he renders substantial assistance to the government in the future.  However,  the government contends that a further reduction beyond its recommendation at this point in time would be inappropriate for a number of reasons.

1.     The health care fraud scheme was one of the most egregious in United States history.  The over $150 million in false claims and over 6.6 million opioids make it one of the largest health care fraud and opioid abuse cases prosecuted by the Department of Justice.  With twelve physicians convicted thus far, the case constitutes one of the largest cases as measured by the number of medical professionals found guilty for administering medically unnecessary services.  Most distressingly, the case involves significant patient harm that was committed by medical professionals who worked in the Tri-County clinics.  These medical

professionals administered unnecessary and painful injections on patients, even when patients objected that they didn't want or need the injections, and even when the screams of the patients were heard throughout the Tri-County clinics. To induce the patients to undergo these unnecessary procedures, the physicians provided them with highly-potent opioid prescriptions that fueled addiction and were resold on the street throughout Michigan and the Midwest. One witness at the trial of four of the Tri-County doctors called the practices at Tri-County "barbaric" and noted that the dynamic at the clinic was wealthy doctors taking advantage of poor, often desperate patients. D.E. 442, Trial Tr. 210:16-20.

      2.     Rashid's role in the scheme as CEO was far from minor. It is undoubtably true that the doctors in the examination room bear the most significant responsibility for violating their Hippocratic Oaths, fueling addiction, and administering injections on patients who didn't want or need them. But it also is true that Rashid helped develop, approve, and enforce the "shots for pills" corporate policy at the Tri-County clinics because it maximized the revenue that was shared by the doctors and himself. Rashid received the largest share of the proceeds and used the fruits of the fraud to live a lavish lifestyle that included spending millions of dollars on courtside NBA tickets, exotic automobiles such as a Rolls Royce and

Lamborghini, Richard Mille watches, and the construction of a luxury mansion with an underground basketball court and rotating garage.

3.      The time period of the criminal conduct was lengthy.  It was measured in years, not months.  The complexity of the efforts to avoid apprehension by law enforcement were also nearly unparalleled, as Rashid and the doctors engaged in sophisticated measures to avoid detection by the FBI, DEA, and other state and federal law enforcement agencies.

4.      Rashid did not seek to cooperate immediately after his arrest and instead sought to obstruct the prosecution, which resulted in his detention by this Court.  It was only after Tasadaq Ali Ahamad (Case No. 17-20479), Glenn Saperstein (Case No. 20468), Abdul Haq (ECF No. 120), Rashid's second-in-command Yasser Mozeb (ECF Nos. 179 and 196), Zahid Sheikh (ECF No. 193), Yousef Almatrahi (ECF No. 202 and 239), Meiuttenun Brown (ECF Nos. 218 and 237), Stephanie Borgula (ECF No. 223), and Hina Qazi (ECF No. 228) all pled guilty that Rashid began to cooperate.  In light of the factors set out in Section 3553, the Court should adopt the government's sentencing recommendation.

## **Background**

Rashid pled guilty to being responsible for submitting over $150 million in false and fraudulent health care fraud claims as part of a scheme that involved

medically unnecessary back injections, prescriptions for powerful, addictive opioids, and the exploitation of vulnerable Medicare beneficiaries. The clinics Rashid operated had a "shots-for-pills" protocol and compelled vulnerable beneficiaries to receive medically unnecessary back injections. In exchange for tolerating the injections, the beneficiaries received prescriptions for opioids, often in dosages suitable only for terminally-ill, cancer patients. The injections were billed to Medicare as "facet joint injections" because that was the most lucrative injection to bill, even though the physicians did not actually administer facet joint injections. Rather, the physicians injected patients with Marcaine, an anesthetic intended only for diagnostic purposes that provided limited, if any, therapeutic relief. Nonetheless, Rashid and his co-conspirators repeatedly billed Medicare for facet joint injections because they knew that Medicare would pay more if they did.

As Rashid testified at trial, he didn't care about patient care – his only goal as CEO of the Tri-County Group was to make money. So he only hired physicians to work in the Tri-County Group pain clinics in Michigan and Ohio who shared his indifference to patient care. Rashid and the physicians agreed that the best way to make money was to get as many patients as possible to come to the Tri-County clinics. And, as Rashid testified, the "floodgates opened" and the patient population "exploded" when the physicians started offering highly potent and medically

unnecessary opioids, such as Oxycontin 30 mg, to the patients.  These powerful and lucrative pills drew legions of addicts and drug dealers to the clinics, and some of the over 6.6 million pills that were distributed by the clinics were resold on the street and fueled cycles of addiction throughout Michigan and the Midwest.

But, as Rashid testified, it is not possible to make big money and live a lavish lifestyle just by distributing opioids.  So when his business partner Frank Patino and other physicians told Rashid that the big money was in administering injections, Rashid, Patino, and the other physicians developed, approved, and enforced a policy at Tri-County clinics requiring patients who visited the clinic to  agree to receive unnecessary, painful, and very expensive injections before they would be given an opioid prescription.  Although patients told the doctors that they did not want or need the injections, the patients were forced through their addiction to agree because, in Rashid's words, "we had complete control [over them] because of the prescriptions."  D.E. 441, Trial Tr. at 24.  And as some of the patients testified at trial, they and their relatives suffered medical harm as a result of the injections, including open sores in their backs.

As part of the scheme, Rashid also opened multiple diagnostic laboratories and paid illegal kickbacks and bribes to the clinic physicians to order expensive and medically unnecessary urine testing and other ancillary services.  The evidence

6

presented at the trial of Rashid's co-defendants showed that the physicians ordered quantitative testing of 56 different drugs for every patient and for every visit, regardless of whether the patient presented any reason for the test. As shown at that trial, the physicians rarely, if ever, consulted the patients about the results and continued to prescribe patients opioids even when the test results showed a potential for drug abuse.

The complexity and sophistication of the efforts to avoid apprehension by law enforcement were nearly unparalleled. In order to stay off the DEA's radar, each physician worked only a few hours a week. When Medicare or its contractors intermittingly investigated the exorbitant number of injection claims being submitted by the Tri-County clinics, Rashid created new companies and simply changed the name on the clinic door, for example from "Tri-County" to "Tri-State." Illegal kickbacks and bribes were paid to the physicians in the form of adjustments to their biweekly payroll, as opposed to separate cash or check payments, to make them more difficult for the government to identify. After being alerted to the existence of this investigation, federal agents observed Rashid withdrawing $500,000 in cash in a duffle bag. And when Rashid was arrested and released pre-trial on a stringent package of bond conditions that prohibited him from traveling anywhere but his house and his attorney's office, he used his physical therapy

trainer as an intermediary to attempt to convince a co-defendant to meet him in the bathroom of his attorney's office for the purpose of obstructing justice and coordinating a false defense to the case.

After being detained and having numerous of his co-conspirators plead guilty, Rashid accepted responsibility. He met multiple times with the government and testified against four of his co-defendants at trial. In one of his early proffers, he spoke movingly of how he had encountered a Tri-County patient in the Federal Correctional Institution in Milan, who had been arrested for an unrelated crime. Rashid stated that he asked this patient whether everything that the government was alleging against him was true and the patient responded that it was. The patient told Rashid what he already knew, but was willing to overlook in the pursuit of money; namely, that the patients going to the Tri-County clinics did not want or need the injections, and that they were exploited by the clinics as a result of their addiction or financial destitution. Rashid became emotional in relaying this story to the government, stated that he wanted to try to make things right, and has cooperated since that date.

## Procedural History

On July 6, 2017, Rashid was charged under seal in a ten-count Indictment. On July 12, 2017, Rashid was arrested, made his initial appearance, and was detained by Magistrate Judge Stafford.  On August 4, 2017, Rashid was released pursuant to a stringent package of bond conditions.  On October 19, 2017, the government moved to revoke bond after Rashid, using his personal trainer as an intermediary, contacted a co-defendant in the case.

On June 5, 2018, a ten-count Superseding Indictment was returned against Rashid.  ECF No. 242.  On June 25 and June 26, 2018, Rashid met with federal agents for the first time pursuant to a proffer agreement.  The proffer agreement stated that the government would consider the "proffer statements in  deciding how to resolve this investigation as it relates to your client and any charges pending against your client being prosecuted by this office."  No promises nor guarantees were provided to Rashid in regard to any eventual plea offer.

On October 15, 2018, Rashid entered a plea of guilty, under seal, before this Court.  ECF No. 311.  Rashid's plea was entered knowingly and voluntarily. Rashid was provided with Sentencing Guidelines worksheets that reflected that he was pleading guilty to an offense with a Guidelines range of Level 44 (Life Imprisonment) if the government prevailed in its position on loss or Level 40 (292-

360 months) if the defense prevailed.  *Id*.  Rashid also entered into a cooperation agreement with the United States.

### United States Sentencing Guidelines ("U.S.S.G.") Section 5K1.1 Motion

After pleading guilty and entering into a cooperation agreement, Rashid cooperated with law enforcement in the Tri-County investigation and unrelated investigations, including debriefing with law enforcement, testifying at the trial of four doctors, and providing information that was of use to the government in prosecuting Patino and others.  Rashid's assistance constitutes substantial assistance to the United States within the meaning of section 5K1.1.  The Government is prepared to provide additional information regarding Rashid's cooperation at sentencing.  Based on the above, the United States requests that the Court reduce Rashid's sentence by approximately 40 percent from the applicable Guidelines range and impose a sentence of 18 years.

### Sentencing Factors

Title 18, United States Code, Section 3553(a), provides numerous factors that the Court is to consider in sentencing Rashid.  Factors pertinent to the instant offense are discussed below, numbered as they are in Section 3553(a).

10

**(1)  The nature and circumstances of the offense and the history and characteristics of the defendant.**

### (A)  Nature and circumstances of the offense

The nature and circumstances of the offense are alarming, not only because of the sheer numbers of false claims and opioids that were distributed, but because of the significant patient harm and exploitation that resulted.   Three Medicare beneficiaries—Travail Smith, Anthony Pitts, and Carla Watson—testified at trial about their visits at Tri-County.  They shared similar experiences: although they told the doctors that the injections were painful and did not help, the doctors ignored their concerns and told them that they would not get an opioid prescription unless they agreed to receive the injections.  D.E. 437, Trial Tr. 14:12-15, 19:11-19 (Smith); D.E. 440, Trial Tr. 20:3-6, 217:1-6 (Pitts);   D.E. 440, Trial Tr. 225:16-21, 217:1-6 (Watson).  Their trial testimony was echoed by dozens of beneficiaries interviewed by law enforcement in this case.

Unlike the four doctors committed at trial, however, Rashid is not a medical professional.  He did not betray the Hippocratic Oath.  He was only infrequently in the examination rooms where the doctors stabbed patients in the back with injections and callously provided them with prescriptions for high-powered opioids that fueled addiction.

But Rashid was the corporate executive running the organization and

ultimately responsible for the treatment protocol at all of the Tri-County Group clinics.  When he met with new doctors, Rashid explained that the defendants' financial return depended on the number of injections that they billed—the focus of their conversation was money, not patient care.  D.E. 441, Trial Tr. at 27:17-31:1.  Indeed, throughout the conspiracy, Rashid, through his biller, instructed the defendants to rotate the location of the injections to avoid scrutiny from Medicare irrespective of the injection services that the defendants actually provided.  *Id.* at 119:17-120:15.  Similarly, Rashid told the doctors to record certain diagnosis codes to guarantee payment, regardless of what conditions, if any, the patients presented.  *Id.* at 60:22-62:18.

Additionally, Rashid described how he and his co-conspirators tried to "stay off the radar."  *Id.* at 40:10-43:18, 128:19-129-7.  He and the other defendants conspired to falsify medical documentation to pass Medicare audits.  *Id.* at 107:24-111:2.  When Medicare rejected 100% of the facet joint claims in 2016, Rashid changed the name of the clinic to Tri-State and continued to bill, while his co-conspirator Pappas agreed to lie and sign as an owner of Tri-State and many of the other doctors agreed to re-enroll with Medicare under the new entity.  *Id.* at 142:7-143:14.

12

Rashid also testified that he paid the defendants kickbacks for their signatures on referrals for ancillary services, such as urinary drug screens, home health care, EMGs, balance tests, ultrasounds, podiatry, and nerve conduction studies.  D.E. 441, Trial Tr. 72:21-80:7.  As to the urine drug screens, he testified that the physicians agreed to omit his ownership of National Laboratories, Inc. on a Medicare audit questionnaire to conceal their illicit financial arrangement.  *Id.* at 104:7-106:16.  When Medicare issued an overpayment request, he merely changed the name of the laboratory to "Nat Labs," to which the physicians continued to refer the same medically unnecessary drug tests.  *Id.* at 107:3-18.

While Rashid is a first time offender, he engaged in ongoing criminal acts for over a decade.  He also engaged in other uncharged conduct, including bank fraud and obstruction, that is not included in the Sentencing Guidelines calculation.

### (B)  The history and characteristics of the defendant

Rashid is a 41 year-old man, who is highly intelligent and well educated. Rashid's parents both moved to Michigan to obtain their PhD's.  Rashid excelled academically and obtained a bachelor's degree in business from the University of Michigan.

Rashid reported that he had a normal childhood and his material needs were met.  He also reported to the Probation Department, however, that he was highly

13

motivated to make money as a result of a childhood in which "money was definitely tight." Rashid testified that he concluded that the best way to make money was to go into Medicare fraud because it was not easily detected by the government. Rashid enjoyed the fruits of the fraud by spending the proceeds on Rolls Royce and Lamborghini automobiles, courtside season tickets to the Pistons, luxury watches, and building a mansion in the Detroit suburbs.

Rashid is married and has two children. Unfortunately, his son has been diagnosed with autism and Rashid's incarceration has impacted his family psychologically and emotionally. The government does not wish to minimize the importance of family ties or the understandable and laudable desire of Rashid to assist his family and raise his children. However, under the law, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6 (Policy Statement). This policy statement was mandated by Congress in the Sentencing Reform Act, which instructed that "in recommending a term of imprisonment or length of a term of imprisonment," the Commission "shall assure that the guidelines and policy statements . . . reflect the general inappropriateness of considering the . . . family ties and responsibilities . . . of the defendant." 28 U.S.C. § 994(e). Accordingly, "[b]ecause the Guidelines disfavor departure based on family responsibilities, such a departure is not permitted

14

except in extraordinary circumstances." *United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003). The circumstances of this case do not present an extraordinary circumstance contemplated under the Guidelines, such as one involving a sole caregiver for a minor child with serious health conditions, and therefore no departure based on family responsibilities is warranted.

### (2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with appropriate education, vocational training, or medical care

The appropriate punishment must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Health care fraud is a substantial problem nationwide and has recently been the subject of sustained public discussions and debate. The National Health Care Anti-fraud Association, an organization composed of both public and private health insurers and regulators, conservatively estimates that three percent of all health care spending in the United States is lost due to fraud. As this Court knows, health care fraud has been a particular plague in the Eastern District of Michigan.

Just punishment is particularly important here because this offense involved not only the theft of substantial sums of money, but also the distribution of opioids to fuel patients' addiction and the administration of injections that resulted in physical

harm. Anything less than a significant sentence is not an appropriate sanction in a situation where Rashid caused the submission of over $150 million in false claims, taking resources designated for the care of the elderly and disabled in order to sustain his own lavish lifestyle.

In addition, Rashid's punishment should take into account not only the scope and seriousness of his own criminal conduct, but also the need to deter future corporate executives from stealing from the Medicare program. The Sixth Circuit Court of Appeals has emphasized that "economic and fraud-based crimes . . . are prime candidates for general deterrence" because these crimes "are more rational, cool, and calculated than sudden crimes of passion or opportunity." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (*quoting United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)). As one of the most significant health care fraud and opioid abuse cases that has been brought against a corporate executive, Rashid's punishment therefore has a particular opportunity to afford general deterrence of Medicare fraud by corporate executives and dispel any misguided perception that they will avoid a criminal sanction if their company is involved in defrauding the Medicare program.

Further, while the government did not seek to charge Rashid with obstruction or apply the obstruction of justice enhancement, after his arrest, Rashid violated his

bond conditions by using intermediaries to make contact with witnesses and one co-defendant, Yasser Mozeb. Rashid was aware that this conduct constituted a violation of his conditions of release. The Court should impose a sentence that seeks to deter such conduct, as well.

In terms of specific deterrence, Rashid is a first time offender, but his criminal conduct occurred for over a decade. As a result of his relatively young age, whatever his sentence, he likely will be released at a time in his life in which he will still have the opportunity to make significant positive contributions to society. A central question is whether Rashid upon release will devote his substantial intelligence to law-abiding endeavors, even though such endeavors will be unlikely to generate the extreme wealth that he enjoyed prior to his incarceration. A significant sentence may specifically deter him from engaging in criminal activity again.

### (3) The kinds of sentences available

Under 18 U.S.C. Section 1349, the maximum sentence is twenty years' imprisonment. The maximum fine is $250,000 or twice the pecuniary gain or loss from the instant offense. Under 18 U.S.C. Section 1957, the maximum sentence is ten years' imprisonment and a $100,000 fine.

**(4)  The sentencing range established by the U.S.S.G.**

The parties are in agreement regarding the sentencing guidelines range that is reflected in the Plea Agreement.  As stated in the Plea Agreement, the Government and the Defendant submit that the Guidelines range for the defendant should be calculated as follows:

| | | | |
|---|---|---|---|
| Base Offense Level: | | 7 | [U.S.S.G. § 2B1.1(a)(1)] |
| Intended Loss | | | |
| | > $150,000,000: | +26 | [U.S.S.G. § 2B1.1(b)(N)] (USA) |
| | > $25,000,000: | +22 | [U.S.S.G. § 2B1.1(b)(L)] (Rashid) |
| HCF Enhancement: | | +4 | [U.S.S.G. § 2B1.1(b)(7)(iii)] |
| Sophisticated Means: | | +2 | [U.S.S.G. § 2B1.1(b)(10)(C)] |
| Vulnerable Victims: | | +4 | [U.S.S.G. § 3A1.1] |
| Role Adjustment: | | +4 | [U.S.S.G. § 3B1.1(b)] |
| Acceptance of Responsibility: | | −3 | [U.S.S.G. § 3E1.1] |
| Total Offense Level: | | 44 (Life) (Government) | |
| | | 40 (292-365 months) (Defense) | |

The Probation Department calculated Rashid's Guidelines based on USSG § 2S1.1, the money laundering offense.  The Probation Department appears to have erred, however, because it added 26 levels for loss over $150,000,000, but this

amount constitutes the loss for the conspiracy to commit health care fraud and wire fraud offense, as opposed to the money laundering offense.  As the amount involved in the money laundering offense was $6.6 million, Rashid's Guidelines should be calculated based on the higher total offense level that results from Count 1, the conspiracy to commit health care fraud and wire fraud offense.

The plea agreement provides that the only issue regarding loss that is permitted to be litigated at sentencing is whether intended loss within the meaning of the Sentencing Guidelines should be calculated based on the higher of the billed or paid amount, as the government contends, or based only on the paid amount, as defendant contends.

The Court should adopt the government's position because the amount billed is prima facie evidence of the amount of loss in a health care fraud case.  "Loss" is defined as "the greater of actual loss or intended loss."  § 2B1.1 cmt. n. 3(A).  In 2011, the Sentencing Commission amended the commentary to USSG §2B1.1 to make explicit that where a defendant is convicted of an offense involving theft from a government health-care program, "the aggregate dollar amount of fraudulent bills submitted to the . . . program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted."  USSG App. C, Amend. 749 (codified at USSG §2B1.1,

comment. (n.3(F)(viii))); *United States v. Opitz*, 704 Fed. Appx. 66, 69 (3d Cir. August 8, 2017) ("Under this special rule, therefore, the amount billed to Medicare is prima facie evidence of intended loss and, if not rebutted is sufficient to establish the loss amount by a preponderance of the evidence."). Importantly, the district court need only make a "reasonable estimate of the loss" (§ 2B1.1 cmt. n.3(C)).

Even prior to the amendment, in cases of health care fraud, courts regularly held that the amount billed to Medicare constitutes prima facie evidence of intended loss. *See*, *e.g.*, *United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011); *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003). These decisions draw their essence from the long-standing presumption in the law that a 'bill is a bill' – that is, that the face amount of a bill is presumptive evidence of the amount that the person who submits it expects to obtain. *Miller*, 316 F.3d at 504. This is a variation of the rule that the face value of a fraudulent instrument may be treated as evidence of the amount that the fraudster intended to swindle. *See*, *e.g.*, *United States v. Blastos*, 258 F.3d 25, 30 (1st Cir. 2001); *United States v. Geevers*, 226 F.3d 186, 192-93 (3d Cir. 2000).

While several circuit courts have adopted a burden-shifting framework to permit a defendant at sentencing to rebut the presumption that the amount billed is the appropriate measure of intended loss, none of these decisions require the use of

the amount paid as the measure of intended loss in the mine-run of cases.   *United States v. Iwuala*, 789 F.3d 1, 14-16 (1st Cir. 2015); *United States v. Singh*, 390 F.3d 168, 194 (2d Cir. 2004); *Miller*, 316 F.3d at 504; *United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011) (expressly adopting the approach taken by the Fourth Circuit in *Miller*); *United States v. Popov*, 742 F.3d 911, 914 (9th Cir. 2014) (following *Miller*).

For example, the fact that Medicare does not pay the entire billed amount under its fee schedule does not justify using the paid amount as a measure of intended loss because "intended loss" includes "intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* cmt. n.3(A)(ii).  For example, the Fourth Circuit in *Miller* rejected the argument that the district court "erred in using the amount [defendant]] billed to Medicare and Medicaid, rather than the payments those programs allow, in estimating the amount of loss he intended because he 'could not have any reasonable expectation to be paid any monies beyond what the programs allow.'" *Miller*, 316 F.3d at 501-04.  In rejecting defendant's argument, the Fourth Circuit reasoned that intended loss "is not limited by the amount of loss that is actually possible or likely to occur as a result of a defendant's conduct." *Id.*

Similarly, in United *States v. Jean*, 647 Fed. Appx. 1, 3 (2d Cir. April 22, 2016), the Second Circuit held that, under its burden-shifting framework, "to the extent the defendant argues that his intended loss was lower than the full amount because insurance companies were unlikely to pay the full claims, the Sentencing Guidelines define 'intended loss' to include harm 'that would have been impossible or unlikely to occur.'"  The Eleventh Circuit in *United States v. Duran*, 620 Fed. Appx. 687, 690-91 (11th Cir. Feb. 25, 2013) rejected a similar defense argument, holding that "though Appellants argue quite strenuously that they could not have received the full amount billed and that it should therefore not be counted in the amount of loss, intended loss includes pecuniary harm that would have been impossible or unlikely to occur."

In addition, under the burden-shifting framework adopted by these appellate courts, a defendant's general knowledge and reasonable expectation that she would not receive the full amount billed to Medicare is not sufficient to rebut the presumption in favor of using the amount billed as the measure of intended loss.  In this respect, courts distinguish between a defendant's "expectation" and their "fraudulent intent."  For example, the Fourth Circuit in *Miller* held that a defendant's argument that "he did not have any reasonable expectation' of receiving the full amount billed" was insufficient to rebut the presumption in favor of using

22

the amount billed as the measure of intended loss.  *Miller*, 316 F.3d at

505.  Similarly, the First Circuit in *United States v. Iwuala*, 789 F.3d 1, 14-16 (1st

Cir. 2015) held that "indirect evidence that a reasonable person would have so

expected [that Medicare would not pay the full amount billed] is not strong" enough

to rebut the presumption that the amount billed is the appropriate measure of

intended loss.  The First Circuit reasoned as follows:

> The defendant argues that he intended to defraud Medicare of no more
> than what Medicare actually paid.  In support, he says that any DME
> provider would have known that Medicare would not pay the full
> amount billed.  *But this is too myopic a view: it overlooks that the
> defendant, at the time of the fraud, was a DME provider who had
> joined forces with an inveterate fraudster in an attempt to bilk
> Medicare out of as much as the traffic would bear.  There is no reason
> to think that a fraudster in that position would have intended to scoop
> anything less than as much as he could from Medicare*."

Under similar circumstances, the Fifth Circuit affirmed an intended loss

calculation based on the billed amounts rather than the paid amounts.  *See United

States v. Umawa Oke Imo*, 739 F.3d 226, 240-41 (5th Cir. 2014) ("The district court

found that even assuming [the defendant] knew that he would not be fully

reimbursed, he sent Medicare and Medicaid bills with the intention that he would be

paid.").  These cases follow the general principle that a fraudster does not get credit

for receiving a lower amount than was billed in a situation where the fraudster is

trying to obtain as much money as possible, and would have kept the money if paid more than she expected to obtain.  *Miller*, 316 F.3d at 504.

Further, even when a defendant testifies that she intended only to receive the paid amount, courts are entitled to reject such testimony as unreliable, insufficient, and/or self-serving.  *United States v. Ainabe*, 2019 U.S. App. LEXIS 27698, *13-15 (5th Cir. Sept. 13, 2019) (holding that amount billed was appropriate measure of loss; evidence that defendant was aware from billing records that one health provider she owned was paid less than it was billed was not sufficient to establish that "she expected another company in another industry to receive less than it billed."); *United States v. Adebimpe*, 649 Fed. Appx. 449, 452 (9th Cir. April 28, 2016) (holding that amount billed was appropriate measure of loss because "[a]lthough Sogbein and Adebimpe presented  some evidence at trial that Medicare commonly pays between 50-80% of the total amount of submitted claims, other evidence showed that the defendants were able to recover much of the remaining amount from Medi-Cal and private insurers.").

This is a classic case where, even assuming that Rashid expected to receive less than the amount billed, "[e]xpectation is not synonymous with intent when a criminal does not know what he may expect to obtain, but intends to take what he can."  *Miller*, 316 F.3d at 505.  That is to say, while Rashid "'may not have

expected to get it all, he could be presumed to have wanted to,'" *id.* (internal quotations omitted), and "[t]here is no reason to think" that Rashid "would have intended to scoop anything less than as much as he could from Medicare." *Iwuala*, 789 F.3d at 14 (1st Cir. 2015) (internal citation omitted).

That is especially true considering that Rashid was on notice that his billing practices were fraudulent. Early in the scheme, one of the Tri-County Group entities – Global Quality Inc. – was audited and Rashid was informed that it was medically unnecessary to bill for repeated facet joint injections. Yet, the Tri-County Group continued to do so. Simply said, the defendant knew for years that his billing practices were corrupt, but he nonetheless continued to fraudulently bill the maximum amounts of claims to Medicare. If he wanted to be held responsible for a lower amount of loss, he could have simply billed less.

### (5)   Any pertinent policy statement issued by the United States Sentencing Commission ("U.S.S.C.")

The United States is unaware of any pertinent policy statements issued by the U.S.S.C. However, the Patient Protection and Affordable Care Act ("PPACA"), enacted in March 2010, provides the most recent evidence of congressional intent in this area of the law. PPACA specifically provides for increased sentences for health care fraud offenses, and further requires the U.S.S.C. to "ensure that the Federal Sentencing Guidelines and policy statements - (i) reflect the serious harms associated

with health care fraud and the need for aggressive and appropriate law enforcement action to prevent such fraud; and (ii) provide increased penalties for persons convicted of health care fraud offenses in appropriate circumstances." Pub. L. No. 111-148, § 10606(a)(3).

### (6)   The need to avoid unwarranted sentencing disparities among defendants with similar records

This sentencing factor is intended to address national sentencing disparities, and it is widely recognized that a Guidelines sentence is the best way to avoid such disparities. *United States v. Smith*, 564 F. App'x 200, 205 (6th Cir. 2014) (stating that "one of the fundamental purposes of the Guidelines is to help maintain national uniformity in sentences, and considering that most sentences are within the Guidelines, the Guidelines themselves represent the best indication of national sentencing practices"); *Rita v. United States*, 551 U.S. 338 (2007).   Rashid's Guidelines range takes into account the specific characteristics of his offense and imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities with similarly-situated defendants nationwide.

While national disparity is the primary concern animating this sentencing factor, the Court also has discretion to consider the potential for disparity between co-defendants. *United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010).  Rashid was charged for his involvement in a scheme with a number of other charged co-

conspirators and is the second defendant to be sentenced.  The defendants involved

in the scheme include the following:

| Defendant | Case No. | Judge | Guilty Plea / Conviction | 5K | Guidelines Range | Sentence |
|---|---|---|---|---|---|---|
| *Spilios Pappas* | 17-cr-20465 | Hood | Conviction | | TBD | |
| *Mohammed Zahoor* | 17-cr-20465 | Hood | Conviction | | TBD | |
| *Joseph Betro* | 17-cr-20465 | Hood | Conviction | | TBD | |
| *Tariq Omar* | 17-cr-20465 | Hood | Conviction | | TBD | |
| *Mashiyat Rashid* | 17-cr-20465 | Hood | Guilty Plea | TBD | 360 Months or 292-360 Months | |
| *Yasser Mozeb* | 17-cr-20465 | Hood | Guilty Plea | | 188-235 Months | |
| *Tasadaq Ali Ahmad* | 17-cr-20479 | Hood | Guilty Plea | | 168-180 Months | |
| *Abdul Haq* | 17-cr-20465 | Hood | Guilty Plea | | 97-120 Months | |
| *Glenn Saperstein* | 17-cr-20468 | Tarnow | Guilty Plea | | 97-120 Months | |
| *Zahid Sheikh* | 17-cr-20465 | Hood | Guilty Plea | | 87-108 Months | |
| *Kashif Rasool* | 17-cr-20744 | Hood | Guilty Plea | | 70-87 Months | |
| *Steven Adamczyk* | 17-cr-20465 | Hood | Guilty Plea | | 57-71 Months | |
| *Tariq Siddiqi* | 17-cr-20692 | Hood | Guilty Plea | | 51-63 Months | |
| *Yousef Almatrahi* | 17-cr-20465 | Hood | Guilty Plea | | 51-63 Months | |
| *Hina Qazi* | 17-cr-20465 | Hood | Guilty Plea | 15% | 35 Months | 20 months |
| *Joshua Burns* | 18-cr-20461 | Hood | Guilty Plea | | 37- 46 Months | |
| *Sealed* | 17-cr-20465 | Hood | Guilty Plea | | 37-46 Months | |
| *Stephanie Borgula* | 17-cr-20465 | Hood | Guilty Plea | | 30-37 Months | |
| *Mieutennun Brown* | 17-cr-20465 | Hood | Guilty Plea | | 30-37 Months | |
| *David Yangouyian* | 18-cr-20451 | Hood | Guilty Plea | | 24-30 Months | |
| *Hussein Saad* | 17-cr-20465 | Hood | Guilty Plea | | 18-24 Months | |
| *Manish Bolina* | 17-cr-20465 | Hood | Guilty Plea | | 18-24 Months | |

## **Conclusion**

Based upon the considerations set forth above, the United States respectfully requests that this Court grant its motion under Section 5K1.1 for a sentence reduction and recommends that the Court (1) impose a sentence of 216 months (18 years), a 40% reduction off of the mid-point of the Sentencing Guidelines range of 360 months; (2) order Rashid to pay restitution in the amount of $51,396,917.70, jointly and severally with his co-conspirators in the fraud; (3) order a special assessment of $200; and (4) order a three-year term of supervised release.

Respectfully submitted,

SAIMA SHAFIQ MOHSIN
Acting United States Attorney

MALISA DUBAL
Assistant Chief
U.S. Department of Justice
Criminal Division, Fraud Section

s/JACOB FOSTER
JACOB FOSTER
Assistant Chief
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C.  20005
Phone:  (202) 615-6521
Email:  jacob.foster@usdoj.gov

Date:  February 15, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel for Defendant.

<div style="margin-left:50%">

s/Jacob Foster
Jacob Foster
Assistant Chief
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C.  20005
E-Mail: jacob.foster@usdoj.gov

</div>

Date: February 15, 2021